AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

FILED

APR 3 0 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| HAKOB KOJOYAN | ) | Case No. |
| | ) | 3 18-70612 MAG |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  March 2017 to March 20, 2018  in the county of  San Mateo  in the  Northern  District of  California (& elsewhere) , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit an Offense Against the United States |
| | Maximum of 5 years in prison |
| | Up to a $250,000 fine |
| | Maximum supervised release term of 3 years |
| | Forfeiture |
| | Restitution, $100 Special Assessment |

This criminal complaint is based on these facts:
Please see the attached affidavit of FBI Special Agent Alexey Abrahams in support of the Criminal Complaint.

(approved as to form _____ AUSA Andrew F. Dawson)

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Alexey Abrahams
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 30 2018

_____
*Judge's signature*

City and state:   San Francisco, CA     Hon. Elizabeth D. Laporte, Magistrate Judge
*Printed name and title*

I, ALEXEY A. ABRAHAMS, Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and state that:

## I.  INTRODUCTION

### A.  Summary

1. There is probable cause to believe that Hakob KOJOYAN is engaged in a conspiracy to distribute prescription drugs without a license and without providing accurate transaction histories. Federal law requires that wholesale pharmaceutical suppliers be licensed by the state in which they do business and provide accurate transaction histories documenting the legitimate source of their prescription drugs.

2. As explained more thoroughly below, KOJOYAN is currently supplying prescription drugs to a wholesale distributor called Mainspring Distribution. KOJOYAN lives in California and to the best of my knowledge is not associated with any entity that is licensed by the State of California to engage in wholesale pharmaceutical transactions. He therefore is not permitted by federal law to engage in wholesale prescription drug transactions. In order to make these transactions appear legitimate, KOJOYAN and a co-conspirator known as Edvin have impersonated a legitimate, licensed pharmaceutical wholesaler called Aarogya Medsurg, LLC. In order to evade law enforcement and regulatory scrutiny, KOJOYAN and others have generated misleading business records designed to lend the appearance of legitimacy—to include bank accounts that appear to be held by a licensed distributor, bank transfer records falsely indicating payments from Mainspring to that licensed distributor, and FedEx shipping records falsely identifying the licensed distributor as the source of certain shipments. In reality, KOJOYAN is not licensed to engage in wholesale pharmaceutical transactions and has no legitimate connection to the licensed distributor.

### B.  Agent Qualifications

3. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigation of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

4. I am a Special Agent with the Federal Bureau of Investigation and been so employed since 2004. During my employment as a Special Agent, I have participated in drug, financial, and organized crime investigations. During these investigations I have gained expertise in law enforcement techniques including the use of physical surveillance, financial examinations of banking records, and witness interviews. I have participated in search warrants and arrests as part of these investigations. I am assigned to the San Francisco Office of the FBI, Organized Crime Squad. As part of my duties within this unit, I investigate violations of federal law, including drug trafficking and diversion, racketeering, fraud, and money laundering.

5. Because this affidavit is submitted for the limited purpose of obtaining an arrest warrant, I have not included each and every fact known to me that supports probable cause for arrest. Rather, I have set forth only the facts that I believe are necessary to support the lawful arrest of the individual listed in this affidavit.

6. In addition, where statements made by other individuals (including Special Agents and law enforcement officers) are referenced in this affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records are referenced in this affidavit, such information is also described in sum and substance and in relevant part.

## II.   APPLICABLE LAW

7. Title 18, United States Code, Section 371, in relevant part, makes it a crime to conspire to commit any offense against the United States.

8. Title 21, United States Code, Sections 331(t), 353(e)(1)(A), and 333(b)(1)(D), in relevant part, make it a crime to knowingly and willfully engage in the unlicensed wholesale distribution of prescription drugs in interstate commerce.

9. Title 21, United States Code, Sections 331(t) and 360eee-1(c) make it a crime to knowingly and willfully engage in the wholesale distribution of prescription drugs without obtaining and providing transaction histories, transaction statements, and transaction information

//

//

## III.   STATUTORY SCHEME

10.  The wholesale distribution of drugs in the United States and its territories is subject to federal and state regulation, including two federal statutes discussed below: the Prescription Drug Marketing Act (PDMA) and the Drug Supply Chain Security Act (DSCSA).  Anyone seeking to engage in the distribution of pharmaceuticals must be licensed in the state and territory in which one does business.  Licensing is required to ensure that drug distributors procure, handle, and store their drugs in a manner that ensures the drugs' effectiveness and safety.  Federal laws and regulations require drug distributors to maintain and provide to purchasers documentation detailing the provenance of the drugs they sell, including a transaction statement, transaction history, and transaction information.  Such documentation must state, among other things, from whom the distributor purchased the drugs.  Such documentation is necessary to ensure the effectiveness and safety of the drugs, to interrupt the development of a black market, and to facilitate any drug recalls.

11.  Drug manufacturers generally set a Wholesale Acquisition Cost ("WAC"), a price they charge wholesalers and other authorized distributors before the application of any rebates, discounts, allowances, and other price concessions.  There is little deviation from the WAC for name brand, non-generic drugs that remain under patent.

12.  United States drug manufacturers generally distribute their prescription drugs to pharmacies, hospitals, and customers through licensed wholesale distributors, who, under federal law, must be licensed by the regulatory authorities for the state in which they distribute drugs.  A prescription drug is frequently bought and sold by numerous licensed wholesale distributors before being purchased by a pharmacy, hospital, or consumer.

13.  The Prescription Drug Marketing Act (PDMA) provides that no person may engage in the wholesale distribution in interstate commerce of prescription drugs in a state unless such person is licensed by the state.  "Wholesale distribution" is distribution of prescription drugs to a person other than a consumer or patient, or receipt of prescription drugs by a person other than the consumer or patient.  A wholesale distributor is a person other than a manufacturer, a manufacturer's licensed partner, a third party logistics provider, or a re-packager engaged in wholesale distribution.

3

14. The Drug Supply Chain Security Act (DSCSA) imposes requirements on wholesale distributors of most prescription drugs, including certain product tracing requirements. Specifically, wholesale distributors of prescription drugs who did not purchase a prescription drug product directly from the manufacturer, the exclusive distributor of the manufacturer, or a re-packager that purchased directly from the manufacturer must provide to the subsequent purchaser, prior to or at the time of each transaction, a transaction history, transaction information, and transaction statement.

15. "Transaction history" means a statement that includes the transaction information for each prior transaction dating back to the manufacturer of the drug product. "Transaction information" includes, among other things, the strength and dosage form of the drug product, the number of containers, the lot number of the drug product, and the business name and address of the persons from whom and to whom ownership is being transferred. "Transaction statement" means a statement that the entity transferring ownership of a drug product is in compliance with the DSCSA.

## IV. STATEMENT OF PROBABLE CAUSE

### A. Initial Investigation into Hakob KOJOYAN

16. I have interviewed a cooperating witness ("CW")[1], who advised that in about March 2017, Hakob KOJOYAN asked him to establish a corporation and a bank account in the name of AML Wholesale. KOJOYAN told the CW that he (KOJOYAN) would pay the CW to liquidate funds in the account into cash, and that the CW would be paid a fee for this service. KOJOYAN told the CW that he had to use the name AML Wholesale because it matched the name of a prescription drug wholesale company that is licensed by the State of California to operate. The CW agreed to the plan, and established approximately three bank accounts in the name of AML Wholesale ("AML Wholesale bank accounts"). KOJOYAN told the CW to tell the bank that AML Wholesale was involved in kitchen and clothing wholesale. KOJOYAN accompanied the CW when he opened one of the AML Wholesale bank accounts. As explained further below, I believe KOJOYAN required an account under this name because he and his co-conspirators wanted to create the impression that they operated on behalf of a

---

[1] The CW is expected to plead guilty to charges related to prescription drug diversion, and is cooperating in the expectation of receiving a sentencing benefit. The CW began cooperating in about September 2017.

4

licensed pharmaceutical wholesaler. Because KOJOYAN and his co-conspirators did not have such a license, they sought to impersonate a licensed wholesaler by opening accounts that appeared to be, but in reality were not, associated with a licensed wholesaler.

17. I have reviewed bank video records associated with one of the AML Wholesale bank accounts, and determined that two males resembling the CW and KOJOYAN were present at one of the banks at the time for the opening of one of the accounts on or about February 3, 2017. These bank accounts were opened in California.

18. KOJOYAN also told the CW that he had a partner in the scheme, whom he called either Edvin or Gegham ("Edvin"). According to KOJOYAN, Edvin controlled an account in the name of Mainspring Distribution ("Mainspring"), and Edvin was responsible for financial transfers from Mainspring to the AML Wholesale bank accounts.[2] KOJOYAN told the CW that the funds transferred from Mainspring Distribution to the new AML Wholesale bank accounts were proceeds from the sale of prescription drugs.

19. I have reviewed records of the Pennsylvania Board of Pharmacy, and determined that a company named Mainspring Distribution has a wholesale pharmaceuticals distribution license in Pennsylvania.

20. KOJOYAN and the CW agreed that the CW, in addition to converting credits from Mainspring into cash in exchange for a fee, would also sell prescription drugs to KOJOYAN and Edvin. KOJOYAN and CW agreed that KOJOYAN would pay the CW for these drugs via additional transfers of money from Mainspring Distribution to the AML Wholesale bank accounts, with the expectation that the CW would keep such additional transfers as payment for the drugs. KOJOYAN told the CW that, in the event of law enforcement action involving their scheme, the CW should flee the country.

21. KOJOYAN told the CW that he weighed each bottle of prescription drugs to ensure that it matched the appropriate weight on the label. KOJOYAN said that sometimes his suppliers would re-label bottles of drugs for something more expensive, or a bottle of drugs would contain "candy" instead of drugs.

---

[2] The Mainspring Distribution bank account has a signer of Edvin Ovasapyan.

22. Based on my review of the bank records associated with the AML Wholesale bank accounts created by the CW at KOJOYAN's direction, between about February 2017 and June 2017 Mainspring Distribution sent the AML Wholesale bank accounts approximately $2.2 million. According to the CW, the CW converted this money into cash using a variety of methods, including buying and reselling gold and writing checks to his friends and associates. A portion of the money was kept by the CW as part of his fee and as payment for prescription drugs that he supplied to KOJOYAN. The CW gave the remainder of the money to KOJOYAN as cash and/or checks with the payee lines left blank.

23. The CW never provided KOJOYAN or anyone else with transaction histories for the drugs which he sold to KOJOYAN, which is required by law. The drugs supplied by the CW to KOJOYAN were transferred in California. According to the CW, and corroborated by my investigation, KOJOYAN lives and works in California.

24. Based on my review of the bank records from Mainspring's bank account, the money sent by Mainspring to "AML Wholesale" was sent via an internet bill-pay service, which identified the recipient as "AML WHLS AAMED LLC" or "AAMED LLC." In addition, in March 2017 Mainspring Distribution sent two wires to the "AML Wholesale" bank account. According to the bank records, the wires were sent to "AAMED LLC, 8351 Elm," but the bank account information was identical to the AML Wholesale bank accounts.

25. I identified a licensed wholesale drug distributor called "Aarogya Medsurg, LLC" (hereinafter, "Aarogya"), which operates out of an office at 8351 Elm Ave., #103, Rancho Cucamonga, California. As noted above, that address was listed in Mainspring's bank records as the recipient of a wire transfer from Mainspring, with the name listed as "AAMED LLC." On or about August 16, 2017, I interviewed Sanjay Patel, who operates Aarogya. Patel advised that Aarogya has a valid license in California to distribute wholesale prescription drugs, but that Aarogya has not yet conducted any wholesale transactions. In other words, Aarogya has never sold wholesale quantities of prescription drugs. Aarogya has only one business bank account at Wells Fargo Bank. Patel has never heard of a company named Mainspring.

26. I believe that the name "AML Wholesale", as used by KOJOYAN, is designed to appear consistent with the initials of the licensed wholesale distributor, Aarogya Medsurg LLC. I also believe that the name "AAMED", also used by KOJOYAN and his coconspirators, is designed to appear consistent with Aarogya Medsurg LLC. I believe the names "AML Wholesale" and "AAMED" were designed to lend an appearance of legitimacy to wholesale drug transactions conducted by KOJOYAN and his partner by suggesting that they were working on behalf of a licensed wholesale business in California.

27. Beyond this attempt to use the identity of Aarogya in the form of AAMED, neither KOJOYAN nor the CW are affiliated with companies licensed in California to engage in the wholesale distribution of prescription drugs.

28. Based upon the evidence recounted above, I believe KOJOYAN was selling prescription drugs to Mainspring, posing as Aarogya Medsurg LLC, which is a licensed wholesale distributor. I believe KOJOYAN instructed the CW to open bank accounts in that name so as to create a fictitious paper trail indicating that the drugs supplied to Mainspring were sold by legitimate, licensed suppliers. In reality, KOJOYAN was purchasing pharmaceuticals from the CW and from others, and then reselling those drugs without a license to Mainspring.

**B.  CW's Cooperation Develops Recordings Describing the Prescription Drug Conspiracy**

29. In about August 2017, I approached the CW and attempted to conduct an interview. In September 2017, the CW began cooperating with my investigation. The CW advised that he had discussed the August 2017 approach by the FBI with KOJOYAN, which caused KOJOYAN to express alarm. In August 2017, prior to the CW's agreement to cooperate and without the involvement of the FBI, the CW told KOJOYAN that money which was in the AML Wholesale bank accounts had been seized by the bank as a result of the FBI interaction.[3]

---

[3] The CW advised the FBI that, in fact, no money had been seized or frozen from the AML Wholesale bank accounts. Rather, the CW had withdrawn and spent the money himself.

30. On or about September 14, 2017, the CW spoke on the telephone with KOJOYAN.[4] This conversation, as well as all the following conversations, was recorded by the CW.[5] During the conversation, in reference to continued transactions with the scheme, KOJOYAN told the CW that, "our Gegham [previously identified as another name for "Edvin," the coconspirator] is waiting quietly. Maybe after November or December." A short time later, KOJOYAN said, "Bro, there is nothing to worry about. I have to talk to him so he would send you. Whether he will want to or not is also questionable." I believe that both of these reference KOJOYAN's partner. The CW and KOJOYAN agreed to establish a new bank account in support of the scheme and had the following exchange:

KOJOYAN: He knows the name; just add a letter, as long as it looks like your name.

CW: Is AAML okay, or AMLE or AMLS?

KOJOYAN: "E" or "S," whatever. It does not matter. As long as it looks the same.

31. On or about September 26, 2017, the CW met with KOJOYAN in the vicinity of North Hollywood, California. I conducted surveillance of this meeting, and observed the CW meeting with KOJOYAN. In reference to the money purportedly seized by the bank from the AML Wholesale bank accounts, the CW asked KOJOYAN if he had talked with "Edvin." KOJOYAN responded that, "He said, 'you lost and that's your problem.'" A short time later during this conversation, the CW told KOJOYAN that he was establishing a new bank account in the name of AMLI.

32. In about October 2017, the FBI established an undercover bank account in the name of "AMLI Wholesale," for the purpose of supporting the investigation into KOJOYAN. The bank account was established in the Northern District of California.

33. On or about October 24, 2017, the CW spoke on the telephone with KOJOYAN, and had the following exchange:

---

[4] The CW initially identified the cell phones used by KOJOYAN, and I have compared the voice of KOJOYAN captured by the recorded telephone conversations and compared them to the voice captured by recordings of the face-to-face meetings, and I have determined that the user of these cell phones is KOJOYAN.

[5] All conversations between the CW and KOJOYAN were in the Armenian language. This conversation, along with other conversations between September 2017 and November 2017, have been reviewed by an FBI Armenian language linguist who produced summaries. I have reviewed those summaries, compared them to the statements of the CW discussing the contents of his conversations with KOJOYAN, and determined that the CW's statements are consistent with the recorded conversations.

1     CW: Why can it not be done, bro? We are in October, bro.

2     KOJOYAN: I called the person and he said it cannot be done because the changes have already
3     begun.

4     CW: What changes, bro?

5     KOJOYAN: Having to do with work…I told him and he said, "That paper has expired. It is not
6     available. It cannot be done now."

7     CW: What paper, bro? The license and stuff?

8     KOJOYAN: Yes, yes.

9     34.     A short time later during that same conversation, the CW and KOJOYAN had the
10 following exchange:

11     CW: Bro, is there no way we can do something so we can make some money?

12     KOJOYAN: Bro, he says, "I don't have the papers. I don't have it."

13     CW: Is it the AML license?

14     KOJOYAN: Yes. It has expired.

15     35.     On or about October 24, 2017, I checked the licensure status of Aarogya, the legitimate
16 company whose identity was being exploited by KOJOYAN. I determined that Aarogya's California
17 license had been suspended. Therefore, I believe that in the above conversation KOJOYAN was
18 expressing concern that the legitimate license in the name of Aarogya, which he and his partner were
19 impersonating in support of their conspiracy, had expired.

20     36.     I checked that status of Aarogya's license again in about January 2018 and determined
21 that it had been reinstated by California.

22     37.     On or about November 20, 2017, the CW talked on the phone with KOJOYAN.
23 KOJOYAN said that he was waiting on payments from his partner for "product."

24     38.     On or about November 30, 2017, the CW talked on the phone with KOJOYAN.
25 KOJOYAN said that he was still waiting to receive a payment of about $150,000 for product which he
26 had supplied to his partner.

27     39.     On or about January 3, 2018, the CW talked on the phone with KOJOYAN. KOJOYAN
28 asked the CW to send him a text message containing the account details for the AMLI Wholesale bank

9

account. KOJOYAN explained that he wanted to use the newly established bank account to pay for Fedex shipping costs. KOJOYAN said that he wanted to ship packages later that day. Following this call, the CW sent KOJOYAN a text message containing the account details of the AMLI Wholesale bank account, including its address in the Northern District of California. CW called KOJOYAN and confirmed that KOJOYAN had received the banking information.

40. A short time later on January 3, 2018, KOJOYAN and the CW talked on the phone. KOJOYAN told the CW that he was having difficulty setting up payments using just the AMLI Wholesale bank account information, and asked for the CW's credit card information to be used in the interim. The CW provided his credit card information to KOJOYAN.

41. I have reviewed records from Fedex, and determined that on or about January 4, 2018, the day after the conversation recounted above, a shipper named "AAMEDS LLC" shipped three packages to Mainspring Distribution. The packages were billed to the CW's credit card. The shipper used an address different from Aarogya, the legitimate wholesale company.

42. I have reviewed security camera video documenting the shipment of these three packages. The video depicts a man who appears to be Harutyun GALSTYAN dropping off three medium sized boxes at a Fedex Office location in the area of Los Angeles, California, at the same time and location as the three boxes described above.

43. I have reviewed records associated with one of the AMLI Wholesale bank accounts that received money from Mainspring prior to the CW's cooperation, and I determined that it used an address of 10325 Vanowen St., Apt. 106, Van Nuys, California. I have determined that GALSTYAN used this same Vanowen St. address when he registered a firearm with California in 2017. According to the CW, KOJOYAN told him that he stored prescription drugs inside the apartment of one of his friends, and that the apartment was the same apartment on Vanowen St. as was used for one of the AMLI Wholesale bank accounts. I have reviewed phone records and determined that between January and November 2017, a cell phone registered to GALSTYAN and a phone used by KOJOYAN exchanged in excess of 700 calls.

44. On or about January 10, 2018, the CW talked on the phone with KOJOYAN. KOJOYAN said that he would be sending the AMLI Wholesale bank account $5,000 to offset future shipping costs.

45. On or about January 11, 2018, I checked the status of the AMLI Wholesale bank account, and determined that it had received an electronic credit of $5,000 from Mainspring Distribution.

46. On or about March 15, 2018, the CW talked on the phone with KOJOYAN. KOJOYAN said that he expected the CW to receive $43,000 in to the AMLI Wholesale bank account. The CW understood that KOJOYAN expected him to liquidate the money into cash and return the cash to KOJOYAN, minus a fee for the CW.

47. On or about March 16, 2018, the AMLI Wholesale bank account domiciled in the Northern District of California received a transfer of $42,000 from Mainspring Distribution.

48. On or about March 20, 2018, the CW met with KOJOYAN in the vicinity of North Hollywood, California. I and other agents conducted surveillance of this meeting, and we observed the CW meeting with KOJOYAN. The CW gave KOJOYAN $40,740 in cash.

49. I believe that, as recounted above, KOJOYAN used the AMLI Wholesale bank account to support his ongoing and unlicensed distribution of pharmaceuticals to Mainspring. I believe KOJOYAN and his partner monitored the status of the Aarogya pharmaceutical license because they knowingly sought to impersonate a licensed distributed as cover for their conspiracy, and that they sought to create the façade of a legitimate distribution operation by generating misleading business records—to include bank accounts that appear to be held by a licensed distributor, bank transfer records falsely indicating payments to that licensed distributor, and FedEx shipping records falsely identifying the licensed distributor as the source of certain shipments. I also believe that KOJOYAN used the AMLI Wholesale account to liquidate a portion of his profits from the scheme.

V. **AUTHORIZATION REQUEST**

38. Based on the foregoing, there is probable cause to believe that Hakob KOJOYAN has committed the following criminal offense from in or about 2017 through in or about March 2018: Title 17, United States Code, Section 371, Conspiracy to Engage in the Unlawful Wholesale Distribution of

1  Drugs in violation of Title 21, United States Code, Sections 331(t), 353(e)(1)(A), 333(b)(1)(D), and
2  360eee-1(c).

**VI.    REQUEST FOR SEALING**

39.    Because this investigation is continuing, disclosure of the contents of this Affidavit will jeopardize the progress of the investigation by causing the conspirators/accomplices to flee or destroy evidence, which could hamper the investigation, I respectfully request that the Court issue an order directing that this Affidavit and any related documents be sealed until the further order of this Court.

40.    Under penalty of perjury, I swear that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____
Alexey Abrahams
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 30 day of April, 2018.

_____
Elizabeth D. Laporte
United States Magistrate Judge